UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**RAMON ALVARADO, JR.,**

        **Plaintiff,**

v.                                                 **Case No. 23-CV-117**

**ALICIA BENSON, et al.,**

        **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Ramon Alvarado, Jr., who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Alvarado was allowed to proceed on two First Amendment retaliation claims against Captain Kyle Tritt; Eighth and Fourth Amendment claims against Alicia Benson, John Birdyshaw, Ian Chacon, Tanner Leopold, Conner Relford, and Tritt for allegedly conducting an unreasonable strip search; and Fourteenth Amendment due process claims against Jeremy Westra and Tritt for failing to give Alvarado notice of his disciplinary hearing and failing to provide him with Tritt's body camera video to use as evidence at his hearing.

The defendants filed a motion for summary judgment. (Docket # 66.) The parties have consented to the jurisdiction of a magistrate judge. (Docket # 24; Docket # 25; Docket # 83.) For the reasons stated below, the defendants' motion for summary judgment is granted.

## FACTS

At all times relevant, Alvarado was incarcerated at Waupun Correctional Institution. (Docket # 67, ¶ 1.) The defendants were all members of the security staff at Waupun. (*Id.*, ¶¶ 2–4.)

1. *Implementation of the Paper Restriction*

On September 6, 2019, Alvarado was housed in the Restricted Housing Unit ("RHU"). (*Id.*, ¶ 5.) The defendants assert that on that day, Alvarado "repeatedly covered his in-cell camera with paper" preventing staff from seeing what Alvarado was doing in his cell. (*Id.*, ¶ 11.) Alvarado states that he covered the camera only once to create privacy so he could use the bathroom and notes that he was allowed to do so. (Docket # 93 at 2; Docket # 94, ¶¶ 13, 38.) Alvarado also notes that he should not have had an in-cell camera because he was not on observation status. (*Id.*)

It is undisputed that because Alvarado was covering his camera, Tritt decided to put Alvarado on a paper restriction. (Docket # 67, ¶ 13.) As part of implementing a paper restriction, staff "remove the inmate from their cell and conduct a search of the cell, and the inmate's person to determine if they are in possession of any contraband items and to ensure that the inmate would be following the impending paper restriction." (*Id.*, ¶ 15.) Alvarado disputes this policy but does not explain why. (Docket # 94, ¶ 15.)

Tritt and Benson went to retrieve Alvarado from his cell to implement the paper restriction. (Docket # 67, ¶ 16.) Both Tritt's and Benson's body camera videos show what happened when they went to retrieve Alvarado. (Docket # 69-2, 69-3.) The video shows Tritt informing Alvarado of the paper restriction, and Alvarado is immediately upset. He tells Tritt that Tritt is preventing him from completing his legal work. Alvarado is agitated

and shouting obscenities. Tritt is calm and explains why Alvarado is being put on a paper restriction. Alvarado acknowledges that he covered his camera twice that day. (Docket # 69-2 at 0:00–2:09.)

Tritt asks Alvarado to place his hands behind his back and turn around so he can secure Alvarado to move him to allow for a search. Alvarado does not comply. Tritt asks Alvarado several times if he is refusing to comply, to which Alvarado responds, "Fuck, let's go!" Alvarado then begins slamming his trap door. Tritt gives Alvarado several more directives, which Alvarado ignores. Tritt states that he is giving Alvarado direct orders, and Alvarado responds, "Fuck your direct orders." Tritt then walks away, telling Alvarado he will be back. (Docket # 69-2 at 2:09–3:02.)

Alvarado states that he was not noncompliant, and when he stated, "Fuck your directives" he "was only implying I did not respect Tritt's order but I was ready to be handcuffed by Tritt and Benson." (Docket # 94, ¶ 29.)

2.    *Cell Extraction and Strip Search*

Because Alvarado was refusing to comply, Tritt ordered a cell extraction and instead of a pat-down search, he ordered a strip search of Alvarado's person out of concern that Alvarado had contraband. (Docket # 67, ¶ 29.) Tritt assembled an extraction team consisting of Benson, Relford, Chacon, Birdyshaw, and Leopold. (*Id.*, ¶ 30.) The defendants state because the cell extraction and strip search were unexpected, pursuant to DOC policy, a female officer could be part of the team. (*Id.*, ¶ 32.) Alvarado disputes this. (Docket # 94, ¶ 32.)

The cell extraction and strip search were video recorded. (Docket # 69-6.) Tritt begins the video with a short explanation of the reason for the cell extraction and the strip

search. Alvarado is extracted from his cell without incident and moved to strip cell 1. (*Id.* at 0:00–5:12.) An officer asks Alvarado if he would comply with a strip search, to which Alvarado says he will. While getting situated for the strip search, Alvarado is complaining loudly about how Tritt denied him a typewriter and that Tritt was retaliating against him because Alvarado threatened to file a grievance about being denied a typewriter. (*Id.* at 5:13–6:00.) An officer begins to give directives for the strip search, and Alvarado complies. (*Id.* at 6:01–8:00.) When Alvarado is directed to run his fingers along his gum line, he adamantly refuses. Alvarado asks to pause the search so he can wash his hands, but his request is refused. Alvarado gets increasingly more upset and refuses to comply with the order to run his fingers along his gum line. Because Alvarado was refusing to comply with directives, Tritt gives an order for a staff-assisted strip search. (*Id.* at 8:01–10:28.) Once the staff-assisted strip search begins, Alvarado yells "sexual assault" repeatedly because the strip search is conducted in the presence of a female officer, Benson. He also yells out several obscenities and states that the officers "searched his balls and searched his penis." (*Id.* at 10:28–11:00.) Despite this, the staff-assisted strip search continues in a routine manner. Alvarado is placed back in his cell without any major incident, but Alvarado is clearly upset, yelling and screaming that Tritt was retaliating against him. (*Id.* at 11:01–17:23.)

The defendants assert that because Alvarado was vigorously refusing to reveal his gum line, Tritt had reason to believe that he was holding contraband. (Docket # 67, ¶ 42.) Tritt saw the request to wash his hands as suspicious because it was likely that Alvarado would attempt to discard the contraband. (*Id.*, ¶ 43.) Alvarado asserts that the refusal to reveal his gum line was not a big deal and that Tritt used his refusal as a pretext to authorize a staff-assisted strip search in an attempt to humiliate Alvarado. (Docket # 94, ¶ 41.) As

4

evidence of this, Alvarado notes that during the staff-assisted strip search, his gum line was not searched. (*Id.*, ¶ 45.)

Alvarado further asserts that Benson, who was holding the handheld camera, was "silently laughing and smirking at me," and that other staff members in the area were looking at Alvarado while nude. (Docket # 96, ¶ 47.) However, the camera footage shows that Alvarado did not have occasion to look directly at the camera or Benson during the strip search and staff-assisted strip search.

       3.      *Conduct Report and Disciplinary Hearings*

Because of Alvarado's behavior during the implementation of the paper restriction and subsequent cell extraction and strip search, Tritt issued Conduct Report #41741, for "violating Wis. Admin. Code §§ 303.28(1)[1], 'Disobeying Orders' and DOC 303.33 'Disruptive Conduct.'" (Docket # 67, ¶ 58.) It is undisputed that Tritt's involvement with the conduct report ended once he issued it and forwarded it to the Security Director. (*Id.*, ¶ 73.)

On September 9, 2019, Security Director Designee James Olson reviewed the conduct report and determined that it should proceed as a "major violation." (Docket # 67, ¶ 74.) Because Alvarado was on a paper restriction on September 9, 2019, the defendants state that non-defendant Officer Jason Rosenthal read Alvarado the notice of his disciplinary hearing. (*Id.*, ¶ 78.) Alvarado states that Rosenthal did not read him the notice of the hearing because Alvarado was sleeping when Rosenthal delivered the conduct report and notice. (Docket # 94, ¶ 78.) It is undisputed that Alvarado did not sign the conduct report at that time. (*Id.*)

On September 20, 2019, Alvarado met with his assigned staff advocate, Karissa Smits, to prepare for the disciplinary hearing. (Docket # 67, ¶ 81.) At this meeting, Alvarado requested video footage, but the defendants assert the request was vague because "Alvarado did not specify what video he was requesting." (*Id.*, ¶ 84.) As such, Westra denied the request. (*Id.*) It is undisputed that Smits also notified Alvarado when his hearing was to be held. (*Id.*, ¶ 85.) The defendants note that Alvarado, who was off his paper restriction by that time, never filed a form DOC 73, Inmate's Request for Attendance of Witness/Evidence for his disciplinary hearing. (*Id.*, ¶¶ 82, 87.)

The hearing was held on September 25, 2019. (Docket # 67, ¶ 89.) The defendants state Alvarado refused to attend the hearing. (*Id.*) Alvarado asserts that he did not refuse, but because he did not get notice of the hearing, he did not attend. (Docket # 94, ¶ 89; Docket # 71-1 at 11.) Westra found Alvarado guilty based off the written narrative in the conduct report. (Docket # 67, ¶ 93.) The defendants state Westra did not rely on any video evidence. (*Id.*, ¶ 94.) Alvarado was given 120 days in disciplinary separation. (*Id.*, ¶ 96.) Alvarado appealed the decision, arguing that procedural errors occurred. (*Id.*, ¶¶ 98–99.) Warden Brian Foster upheld the decision of the disciplinary hearing, denying Alvarado's appeal. (*Id.*, ¶ 102.)

On October 28, 2019, the Institution Complaint Examiner ("ICE") received inmate complaint WCI-2019-18720. (Docket # 71-1 at 11.) Alvarado complained that he did not receive notice of his disciplinary hearing nor did he receive a copy of the conduct report because he was on a paper restriction. (*Id.*) He also stated that he requested video evidence. (*Id.*) The ICE recommended that the Reviewing Authority affirm the inmate complaint. (*Id.* at 8.) The ICE noted that there was no form DOC 73 on the record, likely due to the paper

restriction. (*Id.*) He also noted that the serving officer [Rosenthal] did not remember whether he gave a copy of the conduct report to Alvarado. (*Id.*) He further stated that it was "curious" that the Hearing Officer [Westra] made "an evaluation of the inmate's statement at the hearing in the Reasons for Decision narrative" when Alvarado did not attend the hearing. (*Id.*) The ICE recommended a new hearing, starting with re-serving the conduct report and instructed staff to ensure that Alvarado had an opportunity to request witnesses or evidence. (*Id.*) The recommendation was affirmed and a new hearing was arranged. (*Id.* at 8–10.)

On November 12, 2019, non-defendant Officer Billie notified Alvarado of his rehearing, and he was given a copy of the conduct report. (Docket # 67, ¶ 107.) He was not given a "secondary Notice of Disciplinary Hearing Rights" form because it was a rehearing and "Alvarado already knew what his rights to this hearing were." (*Id.*, ¶ 108.) Alvarado states that because he never received his first notice, he did not know his rights and should have received the secondary notice. (Docket # 94, ¶ 108.)

On November 15, 2019, Alvarado submitted a form DOC 73 requesting the decision for his inmate complaint be used in the hearing. (Docket # 67, ¶ 109.) Alvarado did not request any video to be presented at the rehearing. (*Id.*, ¶ 110.) The defendants note that his initial request made to Smits at the first hearing would carry over. (*Id.*) Alvarado does not dispute this, but he asserts that his request was not vague and he told Smits that he wanted Tritt's body camera video. (Docket # 94, ¶ 110.)

On November 19, 2019, Alvarado met with his assigned staff advocate for the rehearing, Randy Mueller. (Docket # 67, ¶ 116.) Alvarado was uncooperative and did not make a request to Mueller to present any video evidence. (*Id.*, ¶¶ 117–18.)

7

The rehearing was held on November 25, 2019, and Alvarado was in attendance. (Docket # 67, ¶ 120.) Tritt's statements made through the conduct report were submitted as evidence. (*Id.*, ¶ 121.) Alvarado also gave a statement wherein he mentioned that he wanted to present Tritt's body camera video. (*Id.*, ¶ 122.) The defendants state this is the first time Alvarado specified which video he wanted. (*Id.*) Alvarado reiterates that he told Smits which video he wanted and why—to show that Tritt was retaliating against him because Alvarado threatened to file a grievance stating Tritt refused to give him a typewriter. (Docket # 94, ¶ 122.) Westra ultimately "found it more likely than not that Alvarado was guilty of disobeying orders and disruptive conduct." (Docket # 67, ¶ 124.) Alvarado was given a disposition of "time served." (*Id.*) Westra relied on the statement in the conduct report to make his decision. (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the

8

nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Alvarado claims that Tritt violated his First Amendment rights when he ordered the strip search and issued a conduct report in retaliation for Alvarado threatening to file an inmate complaint regarding Tritt denying him a typewriter. Alvarado also claims that Benson, Birdyshaw, Chacon, Leopold, Relford, and Tritt violated his Fourth and Eighth Amendment rights because they conducted the strip search in an unreasonable manner designed to harass and humiliate Alvarado. Alvarado further claims that his Fourteenth Amendment right to due process was violated by Tritt and Westra when he did not receive notice of his disciplinary hearing and when Alvarado was not allowed to present Tritt's body camera video at his hearing.

1. *Retaliation Claim*

To demonstrate a retaliation claim, a plaintiff must show that "(1) [the plaintiff] engaged in an activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor

9

in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). If the plaintiff makes this *prima facie* showing, the defendants must show that the adverse action would have occurred anyway. *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013). In other words, if the plaintiff meets all three initial elements of a retaliation claim, the burden of proof shifts to the defendants to show that they would have taken the same actions "even in the absence of protected conduct." *Green v. Dourff*, 660 F.3d 975, 979 (7th Cir. 2011). If the defendants can make this showing, then the plaintiff must demonstrate that their proffered reason was pretextual (i.e., a lie) and that the real reason was retaliatory animus. *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012).

The defendants concede that filing an inmate complaint is a protected activity under the First Amendment. (Docket # 81 at 10.) Taking the facts in a light most favorable to Alvarado, a reasonable factfinder could conclude that receiving a conduct report and being subjected to an unreasonable strip search would deter Alvarado from filing an inmate complaint. Alvarado also states that he believes his threat of filing an inmate complaint against Tritt was the reason he ordered a strip search and issued the conduct report. Giving Alvarado the benefit of the doubt, he makes a *prima facie* showing of retaliation.

However, no reasonable factfinder could conclude that in the absence of the threat of filing an inmate grievance, Tritt would not have ordered a strip search or issued the conduct report. Both the body camera videos and the video of the strip search show that Alvarado was aggressively non-compliant, shouting obscenities, and making threats. Tritt's body camera video captures Alvarado egging Tritt on by stating "Fuck, let's go!" when Tritt calmly asks him to comply with the directive to put his hands behind his back and turn around so he could secure Alvarado. (Docket # 69-2 at 2:09–3:02.) Alvarado also repeatedly

10

says some version of "fuck your direct orders," which Alvarado does not deny. (*Id.*; Docket # 94, ¶ 29.) Instead, Alvarado argues that his statements were merely an implied message of disrespect because he was "ready to be handcuffed," and that he was being compliant while the officers attempted to handcuff him. (*Id.*) However, the body camera videos clearly show that Alvarado was disobeying orders and was being disruptive. "Where opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 327, 376 (2007). The video shows that issuing a conduct report based of Alvarado's behavior was warranted.

The same is true for the strip search. The body video cameras show that based on Alvarado's reaction to the paper restriction, requiring a strip search was a reasonable course of action. The video of the strip search itself also shows that escalating the strip search to a staff-assisted strip search was a reasonable response. Alvarado was vigorously refusing to expose his gum line and at that point was generally uncooperative.

Alvarado argues that because the officers ended up not actually searching the inside of his mouth during the staff-assisted strip search, Tritt's reason for ordering the staff-assisted strip search must have been pretextual. However, other than his own opinion, Alvarado has no evidence that Tritt's reasons were pretextual. Bald assertions that are not bolstered by more specific evidence are insufficient to create a genuine issue of material fact. *Drake v. Minn Mining & Mfg Co.*, 134 F.3d 878, 887 (7th Cir. 1998).

No reasonable jury could conclude that Tritt's reasons for ordering the strip search and issuing the conduct report were pretextual and that but for the threat of writing an

11

inmate complaint, the strip search would not have occurred or Tritt would not have issued the conduct report. Summary judgment on the retaliation claims is granted in Tritt's favor.

    2.    *Fourth and Eighth Amendment Claims*

"[T]he Fourth Amendment protects (in a severely limited way) an inmate's right to bodily privacy during visual inspection, subject to reasonable intrusions that the realities of incarceration often demand." *Henry v. Hulett*, 969 F.3d 769, 779 (7th Cir. 2020). "Thus, when evaluating a prisoner's search, courts must assess that search for its reasonableness, considering 'the scope of the particular intrusion, the manner in which it is conducted, the justification of initiating it, and the place in which it is conducted.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Strip searches can also violate the Eighth Amendment where "their purpose is 'maliciously motivated, unrelated to institutional security, and hence totally without penological justification.'" *Chatman v. Gosset*, 766 Fed. App'x 362, 364 (7th Cir. 2019) (quoting *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004)).

Alvarado asserts that Tritt ordered the strip search and the staff-assisted strip search to humiliate and harass him. However, the video shows otherwise. As discussed above, Alvarado was noncompliant, refusing to be removed from his cell and then refusing to reveal his gumline. Ordering the searches was not "totally without penological justification" and in fact served a safety and security purpose.

The searches were also not unreasonable. Alvarado admits that the staff on camera were not smiling and laughing at him but states that Benson was "silently laughing and smirking at me." (Docket # 96, ¶ 47.) However, the camera footage shows that Alvarado was not able to look at the camera during the strip searches. No reasonable factfinder could conclude, when looking at the video, that Alvarado's assertions regarding Benson were true.

12

Alvarado also argues that the searches were unreasonable because they were conducted in the presence of a female officer. However, for a search conducted in front of a female officer to rise to the level of a constitutional violation, the inclusion of a female officer must be "intended to humiliate and inflict psychological pain." *Calhoun v. DeTella*, 319. F.3d 936, 939 (7th Cir. 2003). The video clearly shows that the searches were conducted in a professional manner and were ordered as a result of Alvarado's unruly behavior. A female officer was present here because the search was unexpected and she was available. No reasonable factfinder could conclude otherwise. Summary judgement is granted in favor of the defendants on these claims.

    3.    *Fourteenth Amendment Due Process Claim*

"A prisoner challenging the process he was afforded in a prison disciplinary proceeding must meet two requirements: (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Rowe v. DeBruyn*, 17 F.3d 1047, 1053 (7th Cir. 1994)). "Whether a prisoner has a liberty interest implicated by special confinement relies on whether the confinement imposed an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Hardaway v. Meyerhoff,* 734 F.3d 740, 743 (7th Cir. 2013) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). To determine whether a plaintiff has a liberty interest, courts "look[] to 'the combined import of the duration of the segregative confinement *and* the conditions endured.'" *Id.* (quoting *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)) (emphasis in original). "Although relatively short terms of segregation rarely give rise to a prisoner's liberty interest, at least in the absence of exceptionally harsh conditions, such an

interest *may* arise from a long term of confinement combined with atypical and significant hardships." *Id.* (emphasis in original).

At the outset, it is undisputed that Tritt's involvement in the disciplinary hearings ended once he submitted his conduct report to the Security Director. As such, there is no evidence in the record that Tritt was involved in any potential due process violation as it relates to Alvarado's disciplinary hearings. Because § 1983 "creates a cause of action based on personal liability and predicated upon fault; . . . liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Since Tritt did not participate, summary judgment on the Fourteenth Amendment claim is granted in his favor.

As to the claim against Westra, no reasonable jury could conclude that Alvarado had a liberty interest in avoiding segregation. At most, Alvarado was given a disposition of 120 days in disciplinary segregation. Alvarado also did not present evidence that he suffered extreme hardship. The Seventh Circuit Court of Appeals has "noted that 'six months of segregation is not such an extreme term and, standing alone, would not trigger due process rights.'" *Id.* (quoting *Marion*, 559 F.3d at 698). Because Alvarado did not demonstrate that he suffered an atypical and significant hardship while in disciplinary segregation, he has not demonstrated he had a liberty interest. Thus, I need not address Alvarado's arguments that he received deficient process in the form of notice of the hearing and the ability to present Tritt's body camera video footage. Summary judgment is granted in favor of Westra.

14

Case 2:23-cv-00117-NJ   Filed 03/04/25   Page 14 of 16   Document 100

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argued that they were entitled to qualified immunity. Because summary judgment is granted in their favor on the merits, I need not address the qualified immunity arguments. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 66) is **GRANTED**.

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one

year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 4th day of March, 2025.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge